The next case on the calendar today is Nope v. Garland. May it please the court, my name is Lindy Korn from the Law Office of Lindy Korn, PLLC, Buffalo, New York, and I am here in honor to represent Sharon Nope, the appellant. This case is a sensitive case because it involves a woman who had a disability who was a 20-year veteran in EOUSA and was well respected and devoted her entire career to her federal job, which she cherished. And she had for 14 years a female supervisor who gave her nothing but outstanding performance reviews. Indeed, she had good performance reviews up until the end. There was one negative remark towards the end of her career. She was never given any progressive discipline, which is the policy of the EOUSA, before there was a letter of removal issued in February 2016. I would like to turn first to the issue of retaliation, Your Honors. My client had disabilities of celiac disease and IBS and depression. Her supervisor, going back to 2010, Ms. Meltrutter, knew about that. When she needed a leave, she got it. There were no problems. The retaliation claim, I believe, is extraordinarily delicate and significant because my client filed an EEO internal complaint in August of 2015. Ms. Korn, can you address, it seems to me that the key issue, both as it relates to the reasonable accommodation claim and the retaliation claim, is that as of late 2015, your client's doctor said she can't do work of any kind and that was going to be a possible partial recovery date of a year after that. So isn't that really sort of the centerpiece that ended the reasonable accommodation dialogue and that was their articulated basis for her removal? So can you address that? Yes, Your Honor. I believe, with all due respect, that's skipping to the end because the reason that she became, at that time, needing a leave of absence, which she asked for without pay, which was not granted, but the point is when U.S. Attorney William Hochul for the Western District of New York took over in 2012, he told her in one of her first meetings with him that he couldn't believe she was a GS-13, that she made too much money, in essence, and that he could hire five or six attorneys for what he paid her. What does that have to do with retaliation or reasonable accommodation? The reasonable accommodation came up in the summer of 2015 after she had the surgery in June, right? Then she requested an accommodation. You're shaking your head, no, am I wrong about that? Isn't that what happened? She had surgery in June and then she asked for an accommodation after that, right? Isn't that when it happened? No, there was a continuous pattern of needing time off because of the 24-7 requirement that the U.S. Attorney imposed upon Sharon Knope that was not in her job description, but which he put in her work performance plan, and that is when the stress slowly, repeatedly, over a hostile work environment led her to the point in 2015 where she had to go out of work to recover if that was possible. But it was the – I'm sorry, could you just help me with the chronology? I just want to make sure I'm understanding the dates. What was the first request by your client for a reasonable accommodation? Was it in 2013, September 2013? Yes, Your Honor. And that's the one where Guerra said that he was unable to make an informed decision based on the medical information, asked for more medical information, and there was no response from the client, right? At that point, she had only asked for an accommodation for one month. By the time she was able to get to a doctor and get the medical note, the month was over. Well, just to keep it simple. Yes. My question there was am I accurately reporting the facts that she did not respond to the request for more medical information? I understand. I think you're saying that's correct, and now you're telling me why. Yes, Your Honor. Okay. What was the next request for reasonable accommodation? Every time she was expected to answer her phone. There were many times throughout 2014 and 2015. Actually, in 2013, she was reprimanded for not answering her phone. So you're saying every time that they talked about what was going on at work, that was a request for reasonable accommodation? Not every time, but there was. So what was the next time? I mean, give me a date. Maybe it was right afterwards. But what was the next? I had down June 24, 2015. That would have been the next formal request for a reasonable accommodation, Your Honor. However, the hostile work environment, which caused the need for the 2015 reasonable accommodation, cannot be overlooked. And I would like to go back to the retaliation, if I may. And please do, and I apologize for interrupting. But just to be clear, you're arguing retaliation for what? If it's retaliation for asking for reasonable accommodation? No, retaliation for filing an EEO internal complaint about the way she was being treated. Right. So if it's retaliation after that, which was filed in August of 2015,  But we have to ask, was it because of the EEO complaint? Now, I thought you were also saying that there was retaliation for filing a reasonable accommodation request, and that's what I'm trying to get down to. Yes. What are the requests that you claim gave rise to the retaliation? Because when you go back into hostile work environment, now we're talking about something that's different. I get it. That's why she asked for an accommodation. But what's the accommodation that you claim was the triggering event? The accommodation that was triggering the event for a reasonable accommodation was the need to be, to not have to be on call 24-7, because that is what caused her stress that pushed her over the top so that she could, had trouble performing the essential functions of her job. However, the every time Can I ask who decides what's an essential function of the job? Well, that's a very good question. I believe it should be the EOUSA. However, there's a genuine issue of material fact as to whether the U.S. attorney could, in essence, add that requirement, which is a whole other job unto itself, unto Ms. Knope, causing her conditions to become worse and end up needing I thought after hours availability was understood to be part of the job for some time. It was never until 2013 when Mr. Hoku imposed it on her work plan. And none of the other victim witness specialists had that in their plan. And, in fact, the person who replaced Ms. Knope, it said may not ensure. So there was a different standard. That was the purposeful, from the very first time she met with him The essential function has to be in the work plan? He put it in the work plan. It never was in the job description. And one of the issues that a jury needs to decide is whether or not he had the authority to put that in her job, just to make that part of the job. Didn't she say, you know, she objected to that REO? Didn't she say, I've always been on call, so to speak, and I'm more than willing to continue to do that? That was not on 24-7. That was sometimes in the evening due to trials when she was needed. Not 24-7. And I would very much. Did the REO say 24-7? It used the words after the performance improvement plan said ensure availability on evenings, all evenings, weekends, and holidays. But is that 24-7? And Mr. Guerra, who was her supervisor, in testimony said it was 24-7, the equivalent of 24-7. But that's not in the REO. In the REO it says ensure availability. And indeed Sharon Oak asked for clarification. What does that mean? How does, what happens if I'm sick? What happens if I'm on vacation? What happens, how do I get paid for overtime? How do I get paid for comp time? None of these questions were answered. This was a plan to cause Sharon Oak to be too sick to be able to do her job. But I would like to point out very clearly the retaliation piece is key, especially after Burlington v. White, Santa Fe Railroad. After the EEO internal complaint is filed based on a hostile work environment, based on disability and a lack of accommodation, in February 2016, there's a letter of removal that is sent to Sharon Oak. The two people against whom the complaint was made and who gave testimony, they were the ones that issued the removal letter. And furthermore, it has never been that while an EEO complaint is open and under investigation, that a person is removed. And indeed, the report of investigation had not yet come out. What do you mean it has never been? Meaning you've never encountered that? Or is there a law that says you may not? There's a policy in the EEO for the, I think it's within EEO USA, but it's under Title V, that if you file an internal complaint, you have to be given, you either have to be able to go to the Merit Board Protection or EEO, and an investigation has to be done and a report issued. Before that report was issued, she lost her job. Nothing can happen? Ever? Nothing like a termination, a removal letter signed by precisely the people against who the complaint is made. Even if someone comes in and says, I have a doctor's note that said I can't work for a year, you can't take any action against that person? I suppose there are actions you can take, but not a letter of removal. Can I ask you two quick questions? Yes. You didn't brief the age claim. I assume you're abandoning that on appeal. I believe that these claims are intersectional. My answer to you, Your Honor, would be that she was an older woman with a disability. But I'm not pressing that claim today. I'm going with the hostile work environment and the retaliation. And the sex discrimination claim, it seems like the only thing you point to is that there was a sentence and a deposition about a male employee. The whole culture changed for Ms. Knope when Mr. Hulk, who became U.S. attorney, another assistant U.S. attorney, was allowed to say at work, screamed that she was an effing B-I-T-C-H. She complained to HR. Nothing was done. This is a new culture for her. She was, whenever she pointed to a policy about how victim witness program ran, she was told, forget the policy. It's just a guidance. Do what I say. But to point to another male employee, you'd have to have the details of what, you know, this one sentence that he had a non, very serious nonphysical condition to stay, and he was allowed to stay home for quite a period of time. How would a jury ever be able to determine from that? Mr. Hochul, in his deposition testimony, stated that there was a male who had cancer. I know, but you have to develop that, is my point. In other words, it has to be sufficient for there to be an inference, and if we don't know any of the details of that, what the condition was, did he say he was going to be out for a year? We have no idea what the details were. You have to develop that. I understand, Your Honor, but the gender claim goes even without that comparator. We have someone who is allowing, telling a woman she doesn't deserve her GS-13 title, that she makes too much money. This is not allowed in this day and age. All right. Thank you. Thank you. We have Ms. Westprance. Did I pronounce that right? You did, Your Honor. All right. Go ahead. Good morning. May it please the Court. Karen Folster, Westprance, AUSA for the government. Let me just address briefly the 24-7 requirement because the appellant's entire case revolves around this notion that a comment that was added to a performance work plan in 2013 somehow changed what was required of her job in a way that discriminated against her on the basis of her sex and disability. And all of the claims in this complaint arise out of that single comment, that REO in her 2013 work plan. But as much as Ms. Knope tries to convince the Court that that was a material change in her job expectations, it simply was not. The evidence in the record is that there's a plethora of evidence in the record that that was always her job function. She received a pager on day one in the office in 1996 and then a BlackBerry and then an iPhone because it was always understood that emergencies may arise after business hours relating to crime victims and witnesses at criminal trials, kind of a core function of U.S. Attorney's Office that she might need to address. That was an essential function of her job, regardless of whether it was in her work plan. To address Judge Park's question, regardless of whether it was in her work plan, it was an essential function of her job because she was the victim-witness coordinator, and that entails sometimes addressing emergencies after hours relating to victims and witnesses. She had — she testified — her job description early on said that it says may require after-hour — may require availability after hours to deal with emergencies that may arise. The REO says ensure reasonable availability to deal with victim-witness issues after — on weekends and holidays. It's parsing words to say that those are differences. And by Ms. Knope's own testimony, after the REO was added to her work plan, absolutely nothing changed. She was not required to deal with matters of a type or nature or volume that she had never been required to deal with before. She still had a backup in Rochester if she was on vacation. She still had a backup if she was sick, but the question that kept being asked was, how are we supposed to know if you're sick? You know, are you sick any time that you're not at work? And that question was never answered. But the only thing that changed in terms of her after-hours availability is that the number of calls she got was increasing. But by her own testimony, it was increasing from 2010 forward after Mr. Hochul became U.S. attorney because the priorities of the office changed and there were a lot more trials happening. So it wasn't because a job function had changed or been added. It was that the office was doing more trials and so more trial issues were arising. But that was not even a significant increase. To characterize that 24-7, as she calls it, that availability requirement as a new job function, simply because it was a comment in a PWP, is disingenuous. The work plans for multiple years are in the record. If you look at the work plan for a U.S. attorney's office, and for all positions they work the same way, there are core performance elements. These are your core performance elements for your job. Those never changed. One of her core elements was to provide direct services to victims and witnesses. Because there had been an incident in the prior performance cycle in which she failed to do that, where an AUSA on trial tried to reach her on a weekend and could not reach her, and that created an issue for the AUSA in that trial, to address that, there was a comment added into these expected outcomes. What do we expect the outcome for you to be? What outcome do we expect in delivering this performance element that you have always been expected to deliver? Well, we expect that you're going to ensure a reasonable availability to deal with these emergencies. And the reason that we put that comment in your work plan is not because we're adding something new to your job. It's because you failed to do it during the last performance cycle. So we're going to make sure it's documented that that's required. But by her own testimony, it had always been required. There was, you know, just for clarification, my adversary made a number of references to U.S. Attorney Hochul adding that to her PDVP. That's not how it happened. It was Mr. Wary, who was at the time the criminal chief and her direct supervisor, who consoles the work plan. The U.S. Attorney didn't even sign off on that. Can I ask you to address the retaliation claim? And one of the things they point to in their brief, they have statements by Mr. Hochul, where he's explaining the reasons for the removal. And one of the reasons he articulated was that it was not accurate that she was subjected to a hostile work environment. And then he says, I think that went into Joe's consideration as to why she needed to be removed. And then there was another comment, if she was granted leave without pay and the job would be filled, that would give Sharon a basis on which to file a lawsuit. So why isn't that some evidence of a retaliatory motive? For two reasons, Your Honor. The first is that wouldn't even be admissible testimony. It's clear from the record the decision maker on the removal was the first assistant U.S. Attorney, Mr. Kennedy. And the letter comes from Mr. Kennedy, and there's an acknowledgment that he was the deciding official. So the testimony that you just referred to was Mr. Hochul, after the fact, being asked to speculate about what reasons may have motivated Mr. Guerra to make that decision, but purely speculative. And I think the actual words that he used in that portion of the testimony is, that may have also been in his mind at the time. He doesn't know. This is not Mr. Kennedy saying, that's what I based my decision on. This is Mr. Hochul speculating about what somebody else may have thought. But that would be problematic if the decision maker, if that was the reason, that would be problematic, wouldn't it? It would be troubling, Your Honor, but in this case, it would not be causal. As Your Honors have all pointed out, at the time the EEO complaint was made, in August of 2015, Ms. Knope had already been out of work for, I'm sorry, at the time that the letter of removal was issued, in January of 2015, she had already been out of work for seven months. Her doctors were saying that it was going to be at least another year. And she had already, in January, applied for a disability retirement, in which she certified she didn't ever plan to come back to work. So that's the reason for the removal. The U.S. Attorney's Office had been significantly disadvantaged by her absence and needed to replace her and could not replace her, could not hire someone to fill that very important function in the office for as long as she remained an employee. And so had it been considered that she made what was deemed to be a false allegation of hostile work environment, that would be troubling, except for the fact that it was not causal. And so on a retaliation claim, whether BAB or NASSAR is right now the appropriate causation standard for a federal sector retaliation claim under Title VII, she would still, in order to recover damages, as she seeks to do in this case, have to show that that fact coming into somebody's mind was the but-for cause of the ultimate employment action, which you could not do here when the fact is that she couldn't work anymore. Her doctor said she couldn't work anymore. She said she couldn't work anymore. She hadn't worked in seven months. She had certified that she had no intention of coming back to work. She just wanted to stay an employee until— Can I ask you a question about the reasonable accommodation claim? Yes. You heard the argument today that it's not just about 2015, that this is an ongoing reasonable accommodation claim that had been denied previously and culminated in her becoming ill as a result. Do you want to address that? Yes. Respectfully, this notion that every conversation about every time she was required to answer her phone, that was some kind of informal request for accommodation, that argument has not been made before today, and there's certainly no evidence to suggest that she was requesting accommodations at other times. The September 2013 request for accommodation was actually her second one. The first one request was earlier in 2013 for a part-time schedule, which was granted, and she worked part-time for a number of months. It was at the end of that part-time schedule that she submitted the 2013 request for accommodation, that she not be available after hours, and that was the one where she was asked for additional medical evidence and never responded. Until two years later, when in June of 2015 she renews that reasonable accommodation request, there's nothing in the record to suggest at any point that she was asking for a reasonable accommodation for her disability, that she not have to answer calls after hours. The argument that the work environment was so hostile that that's why she couldn't answer calls is really a constructive discharge claim, which was never pled in this action or exhausted administratively, and she simply can't make because what she's claiming was a hostile work environment were her allegations that Hochul's management style was oppressive and he had unreasonable expectations of her, which is an unfortunate, unpleasant work environment, but it's not a hostile work environment based on her disability status or her gender or her age. All right. I think your time is up. Thank you. Thank you. We'll reserve decision. Have a good day. Thank you, Doug. Thank you.